1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**
9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11    ELSA E. MARTINEZ,                        No. CIV S-07-1956-CMK
12             Plaintiff,
13        vs.                                  <u>MEMORANDUM OPINION AND ORDER</u>
14    COMMISSIONER OF SOCIAL
      SECURITY,
15
               Defendant.
16
      _____/
17
18             Plaintiff, who is proceeding with retained counsel, brings this action for judicial
19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).
20    Pursuant to the consent of the parties, this case is before the undersigned for final decision on
21    plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-motion for summary
22    judgment (Doc. 19).
23    / / /
24    / / /
25    / / /
26    / / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on July 7, 2005. In the application, plaintiff claims that disability began on February 27, 2004. Plaintiff claims that disability is caused by a combination of grand mal seizures, depression, borderline intellectual functioning, and visual perception disorder. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 13, 2006, before Administrative Law Judge ("ALJ") William C. Thompson, Jr. In a February 23, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has not engaged in substantial gainful activity since February 27, 2004;

2. The claimant has the following severe impairments: a seizure disorder; borderline intellectual functioning; and depression;

3. The claimants impairments do not meet or medically equal an impairment set forth in the Listing of Impairments;

4. The claimant retains the following residual functional capacity: unable to climb ladders, ramps, and scaffolds; unable to work in hazardous settings, such as unprotected heights or near dangerous machinery; able to follow simple instructions; limited to work requiring only restricted contact with the general public and co-workers; unable to perform work as part of a team;

5. The claimant cannot perform past relevant work; and

6. Considering the claimant's age, education, work experience, and residual functional capacity, a significant number of jobs exist in the national economy which claimant can perform.

After the Appeals Council declined review on July 27, 2007, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

August 26, 2003 – Jinmei Woan, M.D., performed a neurological examination and submitted a report.  See CAR 156-57.  Dr. Woan reported the following history:

> Elsa . . . is a 42-year-old female who was diagnosed with seizures when she was 14 years old.  She was treated with Phenobarbital and Dilantin for about 5 years and then it was discontinued.  She denies any seizures since she was 19 years old until this July when she had one seizure.  Then on August 6 she had the second one this year.  Both episodes occurred while she was at work as a new car inspector. . . .

Dr. Woan also reported that, after the August seizure, plaintiff went to the emergency room and was placed on Phenytoin 300 mg a day and "[s]ince then has not had recurrence of seizures."  Based on this history and a physical examination, Dr. Woan assessed "[s]eizure disorder, partial with secondary generalization."  She did not offer any functional assessment.

September 10, 2003 – Dr. Woan reported on an EEG performed on plaintiff.  See CAR 155.  Dr. Woan reported that plaintiff had one seizure in July 2003, and another on August 6, 2003.  The doctor offered the following interpretation of the EEG testing data:

> The background consisted of 8 to 9 cycles-per-second alpha rhythm bilaterally and symmetrically, maximum in posterior head region.  This activity was reactive to eye opening.  Occasional 4 to 7 cycles-per-second theta rhythm and low amplitude beta activity was recorded from anterior head region bilaterally and symmetrically.  When she went to sleep there were symmetrical vertex sharp waves.  [¶] Hyperventilation and photic stimulation induced no abnormality.

September 18, 2003 – Treatment notes by Dr. Woan indicate "[n]o sz. so far."  See CAR 153.

December 29, 2003 – Treatment notes by Dr. Woan show that plaintiff reported no recent seizures.  See CAR 152.

/ / /

/ / /

March 15, 2004 – Treatment notes by Dr. Woan indicate that plaintiff's last seizure was on December 6, 2003, despite having reported no recent seizures on her previous visit at the end of December 2003.  See CAR 150.

November 22, 2004 – Dr. Woan performed a neurological examination of plaintiff and submitted a report.  See CAR 147-48.  Plaintiff was referred for uncontrolled seizures.  Dr. Woan outlined the following clinical history:

> Elsa . . . is a 43-year-old female who is known to have seizures since she was 14 years old. . . . She did not have any seizures until 2003 when she started having seizures again.  At that point she was placed back on Dilantin.  Until March 2004 she was on Dilantin.  Initially it was 300 mg a day and then increased to 400 mg a day but she started having seizures again while on 500 mg Dilantin.  Since March she has been out of medication and did not seek refill to continue on medication.  The main reason was that she lost her job and had no insurance and no money to buy medication or to see a doctor.
>
> At the present time she states she just got medical insurance, so she is looking for neurological care again.  She says she is having 4-5 seizures a month.  The last seizure was on 11/15/04 and the one prior to that was 11/5.  She has had some injuries to various parts of the body including her teeth.  On 11/5 she went to emergency room where she had blood tests.  She says she was loaded with anti-convulsant before she went home but she did not take any medication after she was discharged from the emergency room.
>
> The seizures are generalized and preceded with some confusion.  She also complains of some memory difficulty.  She is currently not driving as she was restricted from doing so.  For the last one month she has had headaches that occur once a week and are located in right parietal region pressure sensation.

Plaintiff told Dr. Woan that she lost her job at a car dealership due to the driving restriction.  Based on this history and a physical examination, Dr. Woan assessed "[u]ncontrolled seizures secondary to not taking anti-convulsant."  Dr. Woan did not offer any opinion as to plaintiff's functional capacity.

November 22, 2004 – Treatment notes by Dr. Woan reveal that plaintiff ran out of Dilantin in May of that year.  See CAR 149.  Plaintiff's last seizures occurred on November 15, 2004, and November 5, 2004.

November 23, 2004 – Treatment notes by Dr. Woan indicate that plaintiff had a seizure that morning.  See CAR 146.  Medication was continued.

December 28, 2004 – Treatment notes by Dr. Woan indicate that plaintiff had seizures on November 23, 2004, and December 17, 2004.  See CAR 145.  Plaintiff's medications were continued.

January 28, 2005 – Treatment notes by Dr. Woan indicate no seizures "since last seen."  See CAR 143.  Plaintiff's medications were continued without change.

March 24, 2005 – Treatment notes by Dr. Woan reference a seizure at the end of February 2005.  Plaintiff's medications were continued.

April 29, 2005 – Treatment notes by Dr. Woan refer to a recent seizure during a trip to Los Angeles.[1]  See CAR 141.  Plaintiff complained of hair loss and her nails turning yellow.  Medication was continued.

June 21, 2005 – Treatment notes by Dr. Woan indicate that an MRI was not approved.  See CAR 139.  The notes do not reveal any recent seizures.

July 19, 2005 – Treatment notes by Dr. Woan suggest that plaintiff had a seizure on July 16, 2005.  See CAR 138.  Dr. Woan assessed uncontrolled seizure disorder.

August 5, 2005 – Plaintiff's niece, Teresa Rivera, submitted a third-party "Function Report – Adult" concerning plaintiff's daily activities and abilities.  See CAR 91-98.  Ms. Rivera stated that plaintiffs daily activities consist of "taking care of children and house."  She added that plaintiff has three children living at home.  Plaintiff also cares for pets, with the help of her children.  Ms. Rivera stated that plaintiff has no difficulty with personal care activities.  Regarding house chores, she stated that such activities are an "all day thing" because plaintiff needs to rest between chores.  She also stated that plaintiff does grocery shopping twice a month with the assistance of her children and that each outing takes up to two hours.

---

[1]    This must have occurred sometime in the one-month period between March 24, 2005, and April 29, 2005.

Regarding mental capabilities, Ms. Rivera stated that plaintiff is able to pay bills, count change, handle bank accounts, and use a checkbook. As to hobbies and interests, she stated that plaintiff reads, watches television, and does crossword puzzles. She stated that plaintiff finishes what she starts. Ms. Rivera stated that plaintiff has to read instructions out loud in order to understand written instructions and that spoken instructions must be repeated. She stated that plaintiff gets along well with authority figures (i.e., bosses, landlords, etc.) and can adapt, albeit slowly, to changes in routine.

As to plaintiff's seizures, Ms. Rivera stated that any interrupted sleep "provokes a seizure." She added that "[a]ny change of light can bring on a seizure." Ms. Rivera stated that plaintiff does not drive because "[s]he is a risk to the community." She stated that "any stress can trigger a seizure." She concluded by stating that the frequency and duration of plaintiff's seizures have increased with age.

August 6, 2005 – Plaintiff submitted a "Seizure Questionnaire" outlining the history of her seizure disorder. See CAR 80-82. Plaintiff stated that she has had seizures for the past 29 years and that her last four seizures were on August 4, 2005, July 22, 2005, July 15, 2005, and June 10, 2005. She did not state how long the seizures last. She stated that she loses consciousness, has convulsions, bites her tongue, but does not lose bladder control. After the seizures, plaintiff feels worn out, achy, and low on energy "like I'd been hit by a truck." She stated that, after a seizure, it takes her "almost 8 to 10 hrs." to be able to resume normal activity. She stated that medications, which she has been taking for the past two or three years, work "very well" to control her seizure disorder.

August 8, 2005 – Treatment notes by Dr. Woan indicate that plaintiff's last seizure was on August 4, 2005. See CAR 137. Plaintiff reported that she was not sleeping well due to construction near her house.

/ / /

/ / /

August 18, 2005 – Plaintiff submitted a "Functional Report – Adult" detailing information about her daily activities and abilities.  See CAR 83-90.  Plaintiff stated that, on a daily basis, she cleans, reads, prepares dinner, showers, eats, naps, and "go[es] into yard." She added that she does not need any help with household chores.  Contrary to Ms. Rivera's statement, plaintiff stated that she does not care for any children or pets.  Plaintiff stated that she has no problems with personal care activities.

As to mental capabilities, plaintiff stated that she is able to pay bills, count change, handle bank accounts, and use a checkbook.  She also stated that she reads and does puzzles, but that puzzles take her a long time to finish.  In order to understand what she is reading, she stated that she reads out loud and re-reads.  Plaintiff stated that she has difficulty remembering, although she does not need reminders to take care of personal needs or take medication.  She stated that she finishes what she starts.  She also stated that she can only pay attention for up to 30 minutes at a time and, as to instructions, she has to read them "over & over again" to understand.  She rated her ability to follow spoken instruction as "on a scale from 1 to 10, I would say '6.'"  She stated that she gets along with authority figures very well and that she does not have any problems getting along with family or friends.  She added that she does not handle stress well and hates changes in routine.

As to seizures, plaintiff stated that she cannot be around loud noise or flashing lights, and that she does not drive because she considered herself a danger to the community.

August 31, 2005 – T. Tejpal Singh, M.D., reported on a CT of plaintiff's head. See CAR 169.  The doctor's findings were:  "There is no acute intracranial hemorrhage, mass effect or edema" but that there was "[f]rontal scalp swelling. . . ."

September 1, 2005 – Treatment notes by Dr. Woan indicate that plaintiff had two seizures the day before.  See CAR 136.  Plaintiff's dosages of Phenobarbital and Topamax were changed.

/ / /

1        <u>September 17, 2005</u> – Agency examining doctor Steve McIntyre, M.D., performed

2    a comprehensive neurologic examination and submitted a report.  <u>See</u> CAR 214-17.  Based on

3    plaintiff's history and the results of an examination, Dr. McIntyre assessed seizure disorder and

4    provided the following functional assessment:

5        Subjectively, the claimant has a history of seizures.  Apparently, her
     seizures were gone for many years and then returned approximately five
6    years ago.  I have recent clinic reports that indicate that she has been tried
     on a variety of different medications.  It does not appear that she has had
7    sustained treatment with any particular medication regimen.  She is
     currently on Phenobarbital and Topamax. I also do not have blood levels
8    to indicate that she has had therapeutic doses of anti-convulsants.

9        Objectively, there are not significant deficits on neurological examination.

10       Given the history of seizures, the claimant should not work at heights, over
     the water, with very heavy machinery, or in similar capacities that would
11   place herself or others at risk were she to have a seizure.  The current
     examination itself does not point to additional specific functional
12   limitations in terms of time sitting, standing, or walking or lifting or
     carrying.  There are not postural, manipulative, communicative, or
13   cognitive limitations suggested by the present examination.  As indicated,
     if the dosages of the anti-convulsant medication are gradually increased
14   and if she has sustained treatment with particular medications, it is
     common that significant control of the seizures can be obtained.  It would
15   also be worthwhile to check blood levels of anti-convulsants to determine
     if the claimant is compliant with medications.

16

17       <u>September 17, 2005</u> – Agency examining doctor James A. Wakefield, Jr., Ph.D.,

18   performed a psychodiagnostic evaluation and submitted a report.  <u>See</u> CAR 206-09.  Dr.

19   Wakefield reported the following history:

20       Elsa is a 44-year-old woman who is reported to have grand mal
     seizures and difficulty with memory.  The Adult Function Report indicates
21   that she lives with her family, has no problem with personal care, does
     household chores, and reads.  She used to drive but does not now.  Elsa
22   talks with others, mostly on the phone.  She is afraid to be alone and has
     difficulty handling stress. . . .

23

24       Elsa reports that she lives with her three children . . . .  She takes
     Phenobarbital and Topamax and has not had seizures for two weeks. . . .
     She has recently gained 50 pounds.  During the day, Elsa does light
25   housework.  She has no difficulty sleeping at this time.  Elsa went to the
     12th grade in school.  She denied receiving special education services.
26   Elsa left her job as a quality control inspector two years ago. . . .  She had

three seizures on the job and was let go. Elsa does not have any friends at this time.

Based on this history and plaintiff's performance on a number of tests, Dr. Wakefield offered the following summary:

> Elsa . . . reports having seizures which are now controlled by medication. Her intellectual ability is in the borderline range with similar verbal and nonverbal ability levels. Her visual concentration is deficient, but her verbal concentration and her memory over longer time intervals are adequate. Elsa does not appear to have an organic mental disorder.

Dr. Wakefield assess depressive disorder, NOS, and assigned a global assessment of functioning ("GAF") score of 65 on a 100-point scale. The doctor concluded that plaintiff was not able to handle her own funds, can follow simple instructions, should not operate heavy machinery or work at heights. He opined that plaintiff is able to interact with co-workers, supervisors, and the public at a minimally acceptable level. Dr. Wakefield concluded that plaintiff's visual concentration is deficient but that her persistence and pace are adequate.

September 28, 2005 – Agency consultative doctor Charlotte Bible, M.D., submitted a psychiatric review technique form. See CAR 202-05; 210-12. Dr. Bible concluded that plaintiff was mildly limited in activities of daily living, but moderately limited in ability to maintain social functioning, concentration, persistence, and pace. She also concluded that plaintiff was moderately limited in: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; (4) ability to interact appropriately with the public; (5) ability to respond appropriately to changes in the work setting; and (6) ability to be aware of normal hazards and take appropriate precautions. In all other categories of functioning, Dr. Bible concluded that plaintiff was not significantly limited.

/ / /

/ / /

/ / /

October 27, 2005 – Agency consultative doctor Patrick Bianchi, M.D., submitted a physical residual functional capacity assessment.  See 218-25.  He did not find any exertional, postural, manipulative, visual, communicative, or environmental limitations except that plaintiff should avoid hazards associated with heavy machinery and heights.

January 30, 2006 – Plaintiff submitted another "Functional Report – Adult."  See CAR 106-13.  Plaintiff still lived with her three children.  Her daily activities were the same.  However, unlike the prior report, this time she stated that she did take care of her children.  She stated she does not have any problems with personal care activities.  She stated that she prepares meals about four times a week and that her children sometimes bring home meals when she does not feel well.  If she has to use sharp knives or boil water, she has her daughter provide assistance.  Plaintiff stated that she does cleaning, laundry, vacuums, and mops, but does not do any yardwork.

As to mental capabilities, she stated that she requires reminders to take medication, but none for taking care of personal needs, such as grooming.  Plaintiff also stated that she has no difficulty with paying bills, counting change, handling bank accounts, or using a checkbook.  She stated that she reads and does scrapbooking every day and that she does these activities well.  She stated that her impairments limit her memory and concentration, ability to follow instructions, and ability to talk.  Plaintiff added that she could only concentrate on a conversation at the beginning.  As to written instructions, she stated that she has to go over them multiple times to understand.  She stated that she needs help with spoken instructions.  As to her ability to get along with authority figures, she stated:  "Well I'm a believer in showing respect to others."  She stated that she does not handle stress or changes in routine well.

January 30, 2006 – Plaintiff also submitted another "Seizure Questionnaire."  See CAR 122-24.  She stated that she has seizures at least four times a month, with the four most recent seizures occurring on January 1, 2006, December 26, 2005, December 19, 2005, and October 31, 2005.  She stated that the seizures last "about 3 min." and described the same effects

as she did in the prior questionnaire from August 2005.  She stated that it takes her "3 or 4 hrs." and "sometimes a whole day" to recover.  She stated that medication works "very well" to control her seizures.

January 31, 2006 – Plaintiff's daughter, Lilia Martinez, submitted a third-party "Functional Report – Adult."  See CAR 114-21.  Ms. Martinez stated that, on a daily basis, plaintiff cleans the house, makes dinner, watches television or reads, and takes her medication. She stated that plaintiff takes care of her and her two brothers, but no animals.  She stated that plaintiff has no difficulty with personal care activities.  Housework includes cleaning, laundry, sweeping, mopping, dusting, and vacuuming.  She stated plaintiff does not do yardwork.  Ms. Martinez stated that plaintiff only goes grocery shopping once a month with her assistance, and that it takes them about an hour.

Ms. Martinez stated that plaintiff has difficulty remembering and has "delays in answering questions."  She added that plaintiff requires reminders to take medication.  She stated that plaintiff does not have any difficulty paying bills, counting change handling bank accounts, or using a checkbook.  Ms. Martinez stated that plaintiff's impairments result in difficulty with seeing, memory and concentration, talking, and following instructions.  She added that plaintiff needs help with written and spoken instructions.

January 31, 2006 – Treatment notes by Dr. Woan indicate that plaintiff had not had any seizures since October 31, 2005.  See CAR 133.

July 18, 2006 – Treatment notes by Dr. Woan indicate that plaintiff reported two seizures on July 8, 2006.  See CAR 239.

July 31, 2006 – Treatment notes by Dr. Woan do not reference any recent seizures.  See CAR 236.

August 28, 2006 – Treatment notes by Dr. Woan do not reference recent seizures. See CAR 235.

/ / /

1    October 19, 2006 – Treatment notes by Dr. Woan indicate "[n]o seizures." See

2 CAR 234.

3    November 15, 2006 – Les Kalman, M.D., performed a psychological examination

4 and submitted a report along with a medical source statement as to plaintiff's mental functional

5 ability.[2] See CAR 242-54. Plaintiff reported to Dr. Kalman that her chief complaint was

6 depression. Dr. Kalman reported the following on mental status examination:

**Attitude and Behavior**: Patient was cooperative. Her speech was
average rate and volume. Eye contact was fair.

**Intellectual Functioning and Sensorium**: Her responses were rather
delayed. The patient was alert and oriented to person, place, date, and
situation. She recalled two of three objects at five minutes. She was able
to do five digits forwards, three digits backwards. She could do serial 3's
with two errors. She could add, subtract, and multiply. She stated that she
would receive 80 cents change from $1.00 if she bought two oranges at 10
cents each. She recalled three of the past five Presidents. Her abstractions
were intact. She stated that an apple and orange were both fruit and a dog
and cat were both animals. She interpreted the proverb concretely, "You
can't judge a book by its cover," stating "[t]he title could say one thing and
the book could be more interesting." Insight into her mental illness was
poor, her judgment was fair. If she found a stamped, addressed envelope
on the ground, she would put it in a mailbox, and if she were the first
person in a theater to see fire, she would "tell somebody not to go in."

**Affective Status**: The patient's mood was depressed. Her affect was
constricted. Patient appeared despondent, rather morose, sad. She
admitted to suicidal thoughts, but no plans or attempts. No homicidal
thoughts. Neuro vegetative signs include insomnia, anhedonia, decreased
energy level, strong feelings of hopelessness, helplessness, worthlessness.

**Thought Process/Content**: The patient's form of thought was logical and
goal directed. There were no loose associations, no mood swings, no
emotional lability. Thought content: No auditory or visual hallucinations.
There were no delusions elicited.

22 Dr. Kalman diagnosed depressive disorder, not otherwise specified, related to plaintiff's seizure

23 disorder. He also diagnosed "Borderline Intellectual Functioning by history." He assigned a

24 GAF score of 50. He concluded that plaintiff is competent to manage her own funds.

25 _____

26      [2]     This report was submitted to the ALJ by plaintiff's attorney prior to the
administrative hearing.

December 12, 2006 – Plaintiff submitted a hand-written letter to the ALJ.  See CAR 127-28.  She stated:

> My name is Elsa E. Mota Martinez.  I'm hear [sic] today to explain a little about my case.  I have Epilepsy.  I've have [sic] Epilepsy since I was 15 years old.  Today Dec. 13, 2006, I turn 46 and my mind is not as sharp as it should be.  I can honestly say I feel like the living dead.
>
> When I was younger I could do so much, I had so much energy, activity, strength, smarts.  Now, I can't remember very much.  I'm very forgetful.  I confuse very easily.  My biggest . . . worry . . . is that some Dr.s say that I may suffer from "Prosopragnosia."  It's when you can't remember someone but you know who they are.  "Like Absent of the Brain."  I worry because it's happened to me already and it's very embarrassing.  With all do respect sir, these seizures – Grand Mal – have taken my self-esteem from me, my independence, my control to be in society.  Literally we can do something for our lungs if we have problems breathing.  We can do something for our hearts if they are weak or are about to have a heart attack.  We can even do something for most of our major organs if we have some malfunction.
>
> But the Brain?  That's one motor part that you just can't put a wrench to!  My point being is that seizures will happen anytime, anywhere with no warning and no "check gages" [sic] sign.  And once I'm down & out I'm left with absolutely no memory of what happened before.
>
> A total blackout sometimes for 3 or 4 hrs.  Worst of all is that I can't do the simple things in life anymore, and this terrifies me.  Sometimes I just want to die.  Simple things:  swim in the pool, walk to the park, go to the movies, a drive, go to the mall, hold a baby, get on a ride at Disneyland.  Because I can't do these things I'm always so sad that I shouldn't be around anyone.  Especially when I've tried to apply for work and my history comes up that I've had Epileptic seizures at my last jobs.  I feel so discriminated.
>
> Please consider sir I feel like my children are obligated to take care of me and I don't think that's fair to them.  They're very young and need to start their lives too!

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV. DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ erred by failing to evaluate or explain the weight accorded to the medical opinions; (2) the ALJ erred by failing to consider borderline intellectual functioning in assessing plaintiff's residual functional capacity; and (3) the ALJ failed to resolve the conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT").

### A.     Evaluation of the Medical Opinions

Plaintiff argues that, while the ALJ acknowledged the opinions of Drs. Wakefield and Kalman, as well as those of the agency doctors, "he failed to evaluate or explain the weight accorded to any of this evidence." The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an

individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

/ / /

/ / /

Contrary to plaintiff's assertion that the ALJ did not "evaluate or explain the weight accorded to any of the evidence," the ALJ in fact discussed the weight given to the medical opinions. As to plaintiff's physical capabilities, the ALJ stated:

> The medical evidence of record does not document any direct assessment of the claimant's physical residual functional capacity by a treating physician.
>
> In the report of the September 2005 neurological consultative examination [by Dr. McIntyre], the examiner opines that the claimant has had no significant limitations except for non-exertional restrictions related to the claimant's seizure condition.
>
> In assessments dated October 2005 and April 2006, two State Agency physicians describe the claimant's residual functional capacity in comparable terms.
>
> This opinion [by Dr. McIntyre and the agency consultative doctors] seems well-supported by the medical evidence of record and is thus credited with controlling weight. . . .

Thus, the ALJ accepted the opinions of Dr. McIntyre and the agency consultative doctors as to plaintiff's physical residual functional capacity.

As to the opinions regarding plaintiff's mental capabilities expressed by Drs. Wakefield and Kalman, as well as the agency consultative doctors, the ALJ stated:

> In the report of September 2005 psychological consultative examination [by Dr. Wakefield], the examiner assesses several mental imitations including the following: unable to handle her own funds; able to follow simple and some complex procedures; able to interact with other people at a minimally acceptable level; adequately able to reason and make decisions in her best interests; deficient in visual concentration; and able to maintain adequate pace and persistence in tasks.
>
> Similarly, in assessments dated September 2005 and April 2006, two State Agency psychiatrists opine that the claimant has been moderately limited with regard to the following work-related mental functions: understanding, remembering, and carrying our detailed instructions; completing a normal work schedule without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; responding appropriately to changes in the work setting; and maintaining awareness of normal hazards and/or taking appropriate precautions.

16

Additionally, the updated record includes the report of a November 2006 psychiatric evaluation by Dr. L. Kalman, who apparently examined the claimant to provide evidence for the hearing. Dr. Kalman assesses the claimant's GAF as 50, indicative of markedly limiting symptoms. Dr. Kalman also opines that if working, the claimant would likely be absent more than three or four times a month. But otherwise, Dr. Kalman specifically assessed mild and moderate limitation with regard to the claimant's ability to perform most work-related mental functions, an opinion essentially consistent with that of the State Agency psychiatrists.

From this, it is clear that the ALJ accepted the opinions of Dr. Wakefield and the agency consultative doctors. The ALJ also accepted the opinion of Dr. Kalman as "essentially consistent" with those of the other doctors. In fact, the ALJ stated that his mental residual functional capacity was based on ". . . consideration of the overall record, in particular, including the moderate limitations assessed by the consultative examiner, State Agency psychiatrists, and Dr. Kalman. . . ."

Plaintiff's statement that the ALJ did not "evaluate or explain" the weight given to the medical opinions is simply incorrect. Moreover, plaintiff cannot argue that the ALJ improperly rejected a treating physician's opinion because none was provided. Specifically, Dr. Woan never provided a medical source statement as to plaintiff's functional capacity. With respect to the medical opinions, the court agrees with defendant that "Plaintiff fail[s] to establish any legal error in the ALJ's interpretation of the relevant medical evidence. . . ."

**B.**     **Residual Functional Capacity Assessment**

Plaintiff argues: "The ALJ did not consider Ms. Martinez's borderline intelligence (and her deficient visual concentration) in determining her RFC." In assessing plaintiff's residual functional capacity, the ALJ acknowledged the evidence of borderline intellectual functioning. He also recognized that various doctors expressed opinions as to plaintiff's mental capabilities.[3] The ALJ rejected any marked mental limitations because ". . . the record does not document regular psychiatric treatment or psychiatric hospitalization, nor does

---

[3]     The ALJ's discussion of the various opinions is outlined above in Section IV.A.

the record show that the claimant has used any significant psychotropic medications." The ALJ also stated that plaintiff's activities of daily living are inconsistent with marked mental limitations. The ALJ concluded that plaintiff has the following: mental residual functional capacity:

> . . .[A]ble to follow relatively simple instructions; and able to perform work requiring only restricted contact with the general public and co-workers, including an inability to perform work as part of a work team or cooperative work process.

The court finds no error in this conclusion. Specifically, plaintiff's claim that she is limited by borderline intellectual functioning is not supported by the record. Turning first to the various statements from plaintiff and third-party sources, in August 2005, plaintiff's niece, Teresa Rivera, submitted a statement as to plaintiff's capabilities. Ms. Rivera stated that plaintiff is able to pay bills, count change, handle bank accounts, and use a checkbook. She also stated that plaintiff does crossword puzzles and finishes what she starts. Ms. Rivera stated that plaintiff can understand written instructions if she reads them out loud. Similarly, plaintiff can understand spoken instructions if they are repeated. Plaintiff also submitted her own report in August 2005 concerning her mental functioning. This report is consistent with Ms. Rivera's statements. Specifically, plaintiff rated her ability to understand spoken instruction as six on a ten-point scale.

In January 2006, plaintiff submitted another statement as to mental functioning. Once again, she stated that she has no difficulty with paying bills, counting change, handling bank accounts, or using a checkbook. She stated that she reads and does scrapbooking every day and that she does these activities well. This time, however, she stated that her impairments limit her memory and concentration, ability to follow instructions, and ability to talk. Plaintiff added that she could only concentrate on a conversation at the beginning. As to written instructions, she stated that she has to go over them multiple times to understand. She stated that she needs help with spoken instructions. Also in January 2006, plaintiff's daughter, Lilia Martinez,

submitted a third-party statement describing plaintiff's mental capacity.  Her statement is, not surprisingly, similar to plaintiff's January 2006 statement.  Ms. Martinez stated that plaintiff's impairments result in difficulty with seeing, memory and concentration, talking, and following instructions.  She added that plaintiff needs help with written and spoken instructions.

Turning to the medical evidence, there is no indication of intellectual limitation in Dr. McIntyre's September 2005 report.  While Dr. Wakefield, who also examined plaintiff in September 2005, noted borderline intellectual ability and deficient visual concentration, he nonetheless concluded that plaintiff does not have any organic mental disorder and that plaintiff has the ability to follow simple instructions.  Dr. Wakefield also concluded that plaintiff's verbal memory and concentration over longer periods of time are adequate.  He assigned plaintiff a GAF score of 65.  In November 2006, Dr. Kalman reported "Borderline Intellectual Functioning by history."  On objective examination, however, Dr. Kalman found that plaintiff performed adequately.  Specifically, he noted that plaintiff could perform basic math skills and had fair judgment.  Dr. Kalman concluded that plaintiff was competent to manage funds and did not assess any functional limitation due to limited intellectual capacity.

As outlined above, no doctor who assessed plaintiff's capabilities found that she was limited due to borderline intellectual functioning.  To the contrary, plaintiff's ability to handle funds, do puzzles and scrapbooking, understand and follow simple instructions, complete tasks, as well as testing data obtained by Dr. Kalman all indicate that plaintiff's intellectual functioning does not limit her ability to do work at any exertional level.  Therefore, the court finds that the ALJ did not err with respect to his analysis of plaintiff's intellectual capacity.

**C.**     **Vocational Expert Testimony**

Plaintiff argues:

> The ALJ found and asked the vocational expert to assume as part of the hypothetical question that Ms. Martinez is able to follow relatively simple instructions. (Tr 25, 280).  Since the ALJ cited the limitations assessed by the State Agency psychiatrists, (Tr 25), (*not significantly limited* in the ability to understand and remember very short and simple

instructions and *not significantly limited* in ability to carry out very short and simple instructions–Tr 210); and by Dr. Kalman (Tr 25), (*not significantly limited* in the ability to understand and remember very short and simple (one or two step) repetitive instructions or tasks and *not significantly limited* in the ability to carry out short and simple (one or two step) instructions or tasks (Tr 247 - 248), then he must have meant a limitation to jobs having DOT Reasoning Development Level 01 or those that are simple, repetitive in nature.

Based on the vocational expert's testimony, the ALJ found that Ms. Martinez could perform the three jobs identified by the VE office helper having DOT occupation code number 239.567-010 and small products assembler having DOT occupation code number 706.684-022; and linen room attendant having DOT occupation code number 222.387-030. (Tr 26).

However, under the DOT, office helper and small products assembler each has a Reasoning Development Level of 02, and linen room attendant has a Reasoning Development Level of 03. The VE testimony is inconsistent with the DOT and therefore is inadequate evidentiary support of 5th step finding. Legal error for ALJ to rely on incorrect expert opinion – all he had to do was check the DOT definitions in order to verify if expert opinion was correct.

Or, each of the jobs the ALJ found that Ms. Martinez could perform has a Reasoning Development Level of 2 or 3 in the DOT; is not simple, repetitive in nature; and requires significantly greater reasoning development than Ms. Martinez was found to have in the ALJ's RFC determination. Based on this, the job classifications provided (and adopted by the ALJ) clearly conflict with those in the Dictionary of Occupational Titles.

Yet the ALJ nevertheless accepted the VE's conclusion that the classifications did not conflict, and, citing SSR 00-4p, found that his testimony "is consistent with the information contained in the Dictionary of Occupational Titles." (Tr 26). But the ALJ therefore failed, as required by Social Security Ruling 00-4p, to resolve the conflicts before relying on the testimony of the VE to support his determination that there was work that Ms. Martinez could perform and she therefore was not disabled. (emphasis in original; footnotes omitted).

As to the vocational expert's testimony, the ALJ stated:

. . . To determine the extent to which [non-exertional] limitations have eroded the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for a hypothetical individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors such an individual would be able to perform the requirements of representative occupations such as a linen room attendant, office helper, and small products assembler, which, in the local economy, number approximately 7,000, 16,000, and 15,000 jobs, respectively.

> Pursuant to SSR 00-04p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the vocational expert's testimony, the ALJ concluded that plaintiff is not disabled.

Both the ALJ and plaintiff reference Social Security Ruling ("SSR") 00-04p. Under that ruling, the ALJ has an affirmative responsibility to ask the vocational expert about any possible conflict between the expert's testimony and information provided in the DOT. See Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007). The ALJ is required to ask whether the vocational expert's testimony is consistent with the DOT and to obtain an explanation for any apparent conflict. See id. at 1152-53. The purpose of this rule is to ensure that the ALJ properly relied on the vocational expert's testimony. See id. at 1153.

As to conflicts between the vocational expert's testimony and the DOT, a review of the hearing transcript reflects that the following exchange took place between the ALJ and the expert:

> Q: Are your job classifications consistent with those in the Dictionary of Occupational Titles?
>
> A: Yes, they are.
>
> Q: Do they make any departures from the DOT classifications?
>
> A: Just the departures that I mentioned during the testimony as far as erosions [in number of jobs available].
>
> Q: Okay. On what basis are you giving an estimation of the erosion of jobs?
>
> A: Based on helping people with seizures and disabilities and my being familiar with the different employers' practices in the Central Valley.

Based on this exchange, plaintiff's argument is unpersuasive to the extent she argues that the ALJ failed to comply with SSR 00-04p, which merely requires that the ALJ inquire about conflicts and obtain an explanation for any conflict. Here, the ALJ did so and the vocational expert stated that his testimony was not in conflict with the DOT.

It is possible that plaintiff is arguing that the vocational expert was incorrect in stating that his testimony as to jobs plaintiff could perform was consistent with DOT classifications. If this is plaintiff's argument, it is not well articulated. First, plaintiff's counsel did not question the vocational expert at the time of the administrative hearing regarding the expert's testimony that there was no conflict. Second, in her motion for summary judgment, plaintiff clearly states that the ALJ erred by failing to resolve conflicts as required by SSR 00-04p. Here, according to the vocational expert, there was no conflict for the ALJ to resolve and plaintiff did not argue otherwise at the time of the hearing.

Nonetheless, the court will consider the DOT classifications for the three jobs listed by the vocational expert and compare them with plaintiff's residual functional capacity. The court does so in the context of plaintiff's argument that plaintiff's residual functional capacity is inconsistent with the reasoning development levels listed in the DOT for the three jobs identified by the vocational expert. As discussed above, the ALJ concluded that plaintiff has the mental residual functional capacity to follow "relatively simple instructions." According to plaintiff, this capacity corresponds to a reasoning development level of 01.[4] Plaintiff argues that this is inconsistent reasoning development levels of 02 and 03 required for the three jobs identified by the vocational expert.[5]

The court finds no inconsistency. The ALJ's assessment that plaintiff has the ability to follow "relatively simple instructions" is not equivalent to reasoning development level 01 as plaintiff contends. There is nothing in the ALJ's analysis to indicate that plaintiff is limited to only one-step and two-step instructions. To the contrary, the ALJ accepted Dr. Wakefield's opinion that plaintiff was "able to follow . . .some complex procedures." This indicates an ability

---

[4]    The DOT defines level 01 as the ability to carry out simple one-step or two-step instructions.

[5]    The DOT defines level 02 as the ability to carry out detailed but uninvolved written or oral instructions, and level 03 as the ability to carry out instructions furnished in written, oral, or diagrammatic form.

greater than level 01, which is limited to one-step and two-step instructions. Further, Dr. Kalman concluded that plaintiff was no more than moderately limited in her ability to understand and carry out detailed instructions and not significantly limited in her ability to understand and carry out simple one-step and two-step instructions. This also indicates that plaintiff has some ability greater than level 01. Given plaintiff's ability to do scrapbooking and puzzles, she has the ability to carry out instructions furnished in written or diagrammatic form, and there is no evidence that plaintiff is completely unable to carry out oral instructions. In fact, according to plaintiff's own statements, as long as such instructions are repeated, she can understand oral instructions. Thus, plaintiff has an ability consistent with at least level 03. This conclusion is supported by Dr. Kalman's testing results.

Because the ALJ asked the vocational expert whether his testimony conflicted with the DOT classifications as required by SSR 00-04p, and because the vocational expert's answer that it did not is supported by the record, the court finds no error with respect to the ALJ's reliance on vocational testimony in this case.

In reaching this conclusion, the court considers one additional issue – whether the evidence supports the vocational expert's testimony that plaintiff's seizure disorder does not so erode the base of jobs she can perform to the point that no such jobs would exist. As to this question, the following exchange took place at the administrative hearing between the vocational expert and plaintiff's attorney:

> Q: Assume everything the Judge has asked you on the hypothetical. Further assume that instead of missing three to four days a month, the individual would have a grand mal seizure and be unable to complete the remainder of that workday once a month. Assume that would occur once a month, would that affect any of that? Not assuming any other illnesses or sicknesses but just as a result of the grand mal seizure.

> A: The answer to the question is if the employer is aware of the seizure precaution at time of hiring, has hired the person under a reasonable accommodation, the answer is no, it would not affect it.

///

The court observes that, even under the hypothetical posed by counsel, the job base would not be eroded given the requirement that employers make reasonable accommodation. In any event, the record does not necessarily support plaintiff's hypothetical, which describes a person who has seizures on a regular basis.

First, plaintiff's reports of the dates on which seizures occurred are inconsistent. She told Dr. Woan in August 2003 that she had a seizure in July 2003 and another on August 6, 2003. Plaintiff also reported a seizure occurring on December 6, 2003, although she told Dr. Woan on December 29, 2003, that she had not had any recent seizures. Plaintiff was seen by Dr. Woan on March 15, 2004, and reported the December 6, 2003, seizure. There are no medical records covering the time between March 2004 and November 2004. Plaintiff reported seizures occurring on November 5, 2004, November 15, 2004, November 23, 2004, February 5, 2005, and sometime between March 24, 2005, and April 29, 2005. She also reported a seizure on June 10, 2005, although she did not mention this seizure to Dr. Woan when she treated plaintiff on June 21, 2005. Plaintiff reported seizures on July 16, 2005, July 22, 2005, and August 4, 2005. Dr. Woan's treatment notes from September 1, 2005, indicate that plaintiff reported two seizures the day before. In the January 2006 "Seizure Questionnaire" plaintiff reported seizures occurring on October 31, 2005, December 19, 2005, December 26, 2005, and January 1, 2006. At plaintiff's next visit with Dr. Woan on January 31, 2006, plaintiff did not report any seizures in December 2005 or January 2006. She told Dr. Woan that she had not had a seizure since October 31, 2005. Plaintiff next saw Dr. Woan on July 18, 2006, at which time she reported a seizure occurring on July 8, 2006. Plaintiff did not report any subsequent seizures to Dr. Woan.[6] She testified at the administrative hearing in December 13, 2006, that she had experienced four seizures since November 7, 2006, although none were reported to Dr. Woan during this time period.

---

[6] The ALJ's decision references Exhibit 13E, which is purportedly a statement dated sometime in November 2006 by a priest who witnessed plaintiff suffer a seizure at a funeral in September 2006. Exhibit 13E, however, is not contained in the record presented to this court.

Second, not only are plaintiff's reports of the dates seizures occurred inconsistent, plaintiff also seems to have exaggerated their frequency. Plaintiff has repeatedly stated that she has four seizures a month. She even testified at the administrative hearing that, when the seizures first began again in 2003, she would have ". . .one after another up to two times a day." As discussed above, however, plaintiff did not experience seizures with that level of frequency. There is only one instance where plaintiff reported two seizures the same day – August 31, 2005. Plaintiff did not report any seizures occurring between August 6, 2003, and December 6, 2003, and reports of the December 6, 2003, seizure are inconsistent, as discussed above. The next seizure reported by plaintiff occurred On November 5, 2004. Thus, for the 15-month period between the seizures occurring on August 6, 2003, and November 5, 2004, plaintiff reported at most one seizure. On January 31, 2006, plaintiff told Dr. Woan that she had not had a seizure since October 31, 2005. This represents another multi-month period of time during which plaintiff reported no seizures. While plaintiff reported periods during which she experienced up to three seizures in a one-month period, the record does not show that plaintiff ever had four seizures a month for a continuous period of time.

While it is clear that plaintiff has a seizure disorder, the record does not support plaintiff's statements as to the extent of the disorder. The vocational expert's testimony that plaintiff's seizure disorder is not disabling is supported by the evidence.

/ / /

/ /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment (Doc. 18) is denied;

2.    Defendant's cross-motion for summary judgment (Doc. 19) is granted; and

3.    The Clerk of the Court is directed to enter judgment and close this file.


DATED: March 16, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE